<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DARLENE DAVIS MOSES, | Case No.:  2:18-cv-00194 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

**APPEARANCES:**

AGNES S. WLADYKA
AGNES S. WLADYKA, LLC
1122 ROUTE 22 WEST
MOUNTAINSIDE, NJ  07092
        On behalf of Plaintiff

DINA WHITE GRIFFIN
QUINN E.N. DOGGETT
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET, 6TH FLOOR
PHILADELPHIA, PA  19123
        On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Darlene Davis Moses for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401,

et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying

the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

1

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcript, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court affirms the Commissioner's decision that Plaintiff was not disabled.

## I.    PROCEDURAL HISTORY

On January 27, 2014, Plaintiff filed an application for DIB alleging a disability onset date of January 6, 2014.  (R. 175-76)[2]  On June 6, 2014, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 82.)  On November 13, 2014, Plaintiff's application was denied on reconsideration.  (R. 95.)  On October 18, 2016, an ALJ held a hearing on Plaintiff's application; Plaintiff was represented by counsel at the hearing.  (R. 30-81.)  On May 10, 2017, the ALJ issued a decision denying Plaintiff's application.  (R. 13-29.)  On November 9, 2017, the Appeals Council denied Plaintiff's request for review, thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  (R. 1-7.)  On January 5, 2018, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On May 10, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 11.[3]  On March 28, 2019, the case was reassigned to the undersigned Magistrate Judge.  ECF No. 20.

---

[1] On June 17, 2019, Andrew Saul was sworn in as Commissioner of Social Security for a six-year term that expires on January 19, 2025.  Mr. Saul is therefore substituted as Defendant in his official capacity.

[2] "R." refers to the continuous pagination of the administrative record on appeal.  ECF No. 7.

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018). Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ

4

may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).  Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of

benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

> **B.**    **Standard for Awarding Benefits**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 CFR §§ 404.1505(a), 416.905(a).[4] An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id.* §§ 404.1521, 416.921.

---

[4] Disability Insurance Benefits (*see* 42 U.S.C. §§ 401, et seq.) and Supplemental Security Income (*see* 42 U.S.C. §§ 1381, et seq.) are separate programs under Title II and Title XVI, respectively, of the Social Security Act. Although they are subject to different qualification requirements, the standard for determining whether a claimant is disabled is the same for both programs. *See Rutherford v. Barnhart*, 399 F.3d 546, 551 n.1 (3d Cir. 2005) (citation omitted). The Court endeavors to provide citations to the applicable regulations for each program but may provide citations only to the disability insurance benefits regulations. *See Carmon v. Barnhart*, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (explaining that because "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and [supplemental security income]," "[w]e provide citations only to the regulations respecting disability insurance benefits").

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 CFR §§ 404.1520(a)(4), 416.920(a).[5] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id*. §§ 404.1512, 416.912; *see Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (citing *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010)). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 CFR §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is performing "substantial gainful activity." 20 CFR §§ 404.1520(b), 416.920(b). If so, then the inquiry ends because the claimant is not disabled. Otherwise, the ALJ proceeds to Step Two.

At Step Two, the ALJ decides whether the claimant has any "severe medically determinable" impairment or combination of impairments that meets certain regulatory requirements. 20 CFR §§ 404.1520(c), 416.920(c); *see Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (this Step "is a de minimis screening device to dispose of groundless claims"). A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 CFR §§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled. Otherwise, the ALJ proceeds to Step Three.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 CFR §§ 404.1527 and 416.927.

Impairments ("Listing") found at 20 CFR § 404, Subpart P, Appendix 1.  20 CFR §§ 404.1520(d), 416.920(d).  If so, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months.  *Id.* §§ 404.1509, 416.909.  Otherwise, the ALJ proceeds to Step Four.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC") and determine whether the claimant can perform past relevant work.  20 CFR §§ 404.1520(e) & (f), 416.920(e) & (f).  The RFC is the claimant's maximum ability to do physical and mental work activities on a sustained basis despite limitations from impairments.  If the claimant can perform past relevant work, then the inquiry ends because the claimant is not disabled.  Otherwise, the ALJ proceeds to Step Five.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 CFR §§ 404.1520(g), 416.920(g).  Depending on the claimant's limitations, the ALJ will either follow the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 CFR § 404, Subpart P, Appendix 2, or use the Grid Rules as a framework for decision-making.  20 CFR §§ 404.1569a, 416.969a.  The ALJ's consideration at this Step "typically involves 'one or more hypothetical questions posed by the ALJ to [a] vocational expert.'"  *Hess*, 931 F.3d at 204 (quoting *Podedworny*, 745 F.2d at 218).  If the ALJ determines that the claimant can perform other jobs that exist in significant numbers in the national economy, then the claimant is not disabled.  Otherwise, the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

### III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was thirty-eight years old on January 6, 2014 (alleged onset date), and her date last insured was December 31, 2018.  (R. 18, 24.)  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 18.)  At Step Two, the ALJ found that Plaintiff had the following severe impairments:  multiple sclerosis, hypertension, spinal disorder, respiratory disorder, and affective disorder.  (R. 20.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing.  (R. 18.)  At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work subject to various exertional and non-exertional limitations.  (R. 20.)  The ALJ also found at Step Four that Plaintiff was unable to perform her past relevant work as a receptionist, office manager, and secretary.  (R. 24.)  At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 201.28 if Plaintiff had the RFC to perform the full range of sedentary work.  The ALJ also found at Step Five that at least 3 jobs – document prep worker, scale operator, and preparer – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC.  (R. 25.)  The ALJ concluded that Plaintiff was not disabled from the alleged onset date through February 24, 2017 (decision date).  (R. 25.)

As best the Court can discern from her briefs, Plaintiff contends that the ALJ committed three reversible errors:  (1) at Step Four, the ALJ erroneously discounted Plaintiff's subjective symptoms; (2) also at Step Four, the ALJ's RFC finding did not reflect all of Plaintiff's credibly established limitations; and (3) at Step Five, the ALJ failed to include all of Plaintiff's credibly

established limitations in the hypothetical questions presented to the VE.[6]  Plaintiff asks the Court to remand for payment or, alternatively, for a new hearing.  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.    SUMMARY OF RELEVANT EVIDENCE

### A.    <u>Medical Evidence.</u>

#### 1.    **Treating Providers.**

On January 6, 2014, Plaintiff was admitted to East Orange General Hospital.  She had no history of any major medical illness, but she complained about a sudden onset of paresthesias and weakness on the left side of her face with heaviness and weakness in her left arm.  She was initially diagnosed with an acute cerebrovascular incident (stroke) but was ultimately diagnosed with multiple sclerosis based on an MRI of her brain.  She was discharged on January 13, 2014 with two-day prescriptions for each Lovenox, Percocet, and Ambien.  She was also given prescriptions for Lipitor and Prednisone, and she was instructed to take aspirin and acetaminophen daily.  (R. 272-301.)  On January 24, Plaintiff saw Dr. Hasmukh Sutaria (neurology) for pain caused by spasms on her right side.  Plaintiff denied any new weakness, tingling, or numbness in the arms or legs.  She stated that Dr. Colin Pemberton (internal medicine) had recently prescribed Baclofen but that it was not helping.  Physical examination findings were normal except for right sided facial weakness, severe intermittent spasm of the right arm and leg, and mildly ataxic gait.  Dr. Sutaria ordered a cervical MRI to rule out cervical myelopathy from multiple sclerosis.  Dr. Sutaria also

---

[6] The alleged error about which Plaintiff complains at Step Five – the failure to include additional limitations in the RFC finding – involves Step Four, where the burden of proof rests with Plaintiff.  *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005).

increased Plaintiff's Baclofen dosage; prescribed physiotherapy, Ativan, and Prilosec; and instructed Plaintiff to continue taking Prednisone. (R. 358-59.) On January 29, Plaintiff returned to Dr. Sutaria for right sided stiffness and spasm but with no new complaints. Physical examination findings were the same, and Dr. Sutaria prescribed physiotherapy and Klonopin. (R. 360-61.)[7]

On February 4, 2014, Plaintiff was re-admitted to East Orange General Hospital. Plaintiff complained about difficulty walking and aches, pains, and muscle spasms throughout her body. She also complained about coughing, shortness of breath, sore throat, and chest tightness. Physical examination findings included an obvious left-sided facial asymmetry; ability to move all extremities grossly but increased tone with spasticity on the right side; brisk bilateral deep tendon reflexes; steady station; and slightly spastic gait. An MRI of Plaintiff's cervical spine revealed plaque consistent with multiple sclerosis and mild disc herniations with mild stenosis at C4-5 but no cord impingement. Results from an MRI of her brain were unchanged from the prior month. She was treated with steroids and discharged on February 7 when the exacerbation was in remission. Plaintiff was prescribed Lipitor, Prednisone, Baclofen, Klonopin, Prilosec, and Protonix, and was instructed to follow up with her physician within 7 days. (R. 302-29.)

On February 12, 2014, Plaintiff saw Dr. Sutaria for right sided stiffness and spasm but with no new complaints. Physical examination findings were normal except for right sided facial weakness, severe intermittent spasm of the right arm and leg, and mildly ataxic gait. Dr. Sutaria noted that Plaintiff's cervical spine MRI showed myelopathy in the mid-cervical area consistent with multiple sclerosis plaque. Dr. Sutaria added Rebif (interferon) to Plaintiff's prescriptions. (R. 362-63.) On February 20, Plaintiff saw Dr. Pemberton and complained about a cough, runny

---

[7] There is no evidence in the record that Plaintiff underwent physiotherapy.

nose, sore throat, fever and wheezing with occasional shortness of breath.  She was prescribed Lyrica and an inhaler.  (R. 330-32.)

In March 2014, Plaintiff saw Dr. Sutaria and advised that the numbness and weakness on her right side were better and that she had no muscle spasms and no new complaints.   Physical examination findings were normal except that right sided facial weakness and numbness persisted (but had not worsened), and Plaintiff had a mildly unsteady gait.  (R. 364-65.)  In April 2014, Dr. Sutaria completed a General Medical Report form that is described in detail in Section V.A. below. To avoid repetition, the Court summarizes in the chart below Dr. Sutaria's treatment notes for May 2014 to May 2016 (R. 366-75, R. 389-96):

| Date | Plaintiff's Reported Complaints | Dr. Sutaria's Examination Findings | Dr. Sutaria's Instructions |
| --- | --- | --- | --- |
| May 2014 | Improved numbness and weakness on right side; no muscle spasms | Same as March 2014 | No change |
| Jul 2014 | Recent blood test results revealed low platelet count | Same as March 2014 | No change; ordered additional blood tests because low platelet count (thrombocytopenia) is a side effect of Rebif |
| Aug 2014 | Muscle spasms | Same as March 2014 | Additional blood tests results were normal; added multivitamin to Plaintiff's medications |
| Dec 2014 | Muscle spasms, lower back pain, and intermittent spasms and pain in her right arm; depressed due to "relation with her husband." | Same as March 2014 | Added Lexapro and Ambien to Plaintiff's medications |
| Feb 2015 | Muscle spasms, intermittent back and neck pain, difficulty ambulating | Same as March 2014 except that Plaintiff's gait was unremarkable (i.e., no longer mildly ataxic) | No change; cautioned against taking Klonopin, Ativan, and Ambien together to avoid sedation and drug interaction |

| Date | Plaintiff's Reported Complaints | Dr. Sutaria's Examination Findings | Dr. Sutaria's Instructions |
|---|---|---|---|
| Apr 2015 | Muscle spasms, intermittent back and neck pain | Same as February 2015 | No change |
| Oct 2015 | Muscle spasms, neck pain, and fatigue | Same as February 2015 | No change |
| Dec 2015 | Muscle spasms, neck pain, intermittent fatigue; under stress due to "kids" | Same as February 2015 | Added Naproxen to Plaintiff's medications; cautioned against taking Klonopin, Ativan, and Ambien together to avoid sedation and drug interaction |
| Feb 2016 | Muscle spasms and neck pain not as bad; remained under stress; fatigue after taking Rebif | Same as February 2015 | No change; cautioned against taking Klonopin, Ativan, and Ambien together to avoid sedation and drug interaction |
| May 2016 | Under stress due to lack of medical coverage and inability to pay for Rebif | Same as Feb 2015 | No change; cautioned against taking Klonopin and Lexapro together to avoid sedation and drug interaction; advised to apply for charity care program until medical coverage addressed |

Plaintiff was treated by Dr. Satish R. Mehta (internal medicine) from May 2014 to February 2016. Dr. Mehta's treatment notes are summarized in the chart below (R. 397-419):

| Date | Plaintiff's Reported Complaints | Dr. Mehta's Examination Findings | Dr. Mehta's Instructions |
|---|---|---|---|
| May 2014 | Lower back pain and increased frequency of urination. | Normal | Schedule follow-up |
| Jun 2014 | Heaviness in upper extremities | Normal | Prescribed Vitamin D |
| Sep 2014 | Spasticity | Normal | Prescribed Vitamin D |
| Jul 2015 | None | Normal | No change |
| Oct 2015 | None | Normal | Prescribed Lipitor |

| Date | Plaintiff's Reported Complaints | Dr. Mehta's Examination Findings | Dr. Mehta's Instructions |
|------|--------------------------------|----------------------------------|--------------------------|
| Feb 2016 | Bug bites and inability to sleep | Normal | Prescribed hydrocortisone ointment and Ambien |

Plaintiff was treated by Dr. Pankaja B. Achar (pulmonology) in January, May, June and September 2014; July 2015; and February 2016. Neither Plaintiff's counsel nor the Court can summarize Dr. Achar's treatment notes because they are illegible. *See* ECF No. 14 at 5 (citing (R. 337-48, 378-80)).

### 2. Consultative Examiner.

In June 2014, Plaintiff underwent a consultative examination by Dr. Marc Friedman (psychologist). Plaintiff provided Dr. Friedman with a verbal summary of her medical history and subjective symptoms. (R. 333, 335.) Dr. Freidman's examination findings were as follows:

> She spoke using complete sentences. Speech was clear and understandable. Associations were generally logical and sequential and there were no signs of a thought disorder. The volume of speech was appropriate. Speech was goal oriented and relevant. She did make spontaneous comments. She did initiate and sustain conversation. She was able to follow the topic of a conversation. Mood was very sad, and she was frequently on the verge of tears, and affect was severely constricted. She did not smile and did not display a sense of humor. She did not show signs of anxiety during the interview. She is not reporting hallucinations and her thinking does not appear to be delusional. She is not reporting suicidal ideation or intent. She was oriented as to date and location. In terms of long-term memory, she had little difficulty recalling dates of past events. She had no difficulty remembering events from her childhood or teenage years. She was able to recall the current president and previous 2 presidents. She also remembered Mr. Reagan. She was able to remember what she ate for lunch yesterday. In terms of short-term memory, she was able to remember only 1 out of three objects after a three minute delay, and only 1 object after a five-minute delay. In terms of working memory, she was able to correctly repeat 5 digits and say 4 digits in reverse order. She was able to perform serial sevens correctly. She was able to perform serial threes correctly. She was able to spell "WORLD" correctly, and backwards. She was able to calculate 6 times $.25. She had no difficulty with abstraction. Fund of information was limited. For example, she knew who Martin Luther King Jr. was, but not where Brazil is located, or who wrote Hamlet. In terms of judgment, if she was the first person to notice a fire starting in a movie theater, she would run. If she found a letter in the street addressed to someone else she would mail it. Based

on her history and presentation during the interview, I would estimate that judgment is fair, and impulse control is fair. Her level of intellectual functioning is estimated to be within the average range. She did appear to be trying her best during problem-solving attempts. Her persistence in completing tasks was adequate. Her ability to pay attention and focus was adequate. She was able to follow multi-step directions. Social interaction skills were somewhat limited during the interview. Long-term and working memory appeared to be adequate. Short-term memory appeared to be mildly impaired.

(R. 334-35.) Dr. Friedman opined:

Based on the claimant's self-report, as well as on observations made during the interview, I would conclude that she is showing symptoms of a major depressive disorder. During the interview she was able to communicate clearly and she was able to follow the topic of a conversation. She was able to comprehend and follow multi-step directions. Her social interaction skills were somewhat limited. Her ability to concentrate was adequate. Her long-term memory and working memory appeared to be adequate. Short-term memory was mildly impaired. Prognosis is fair with outpatient psychiatric treatment. Condition can be expected to last at least one year.

(R. 335-36.)

### 3.    State Agency Reviewing Consultants.

In June 2014, State Agency reviewing consultants opined that Plaintiff did not meet the Listing 12.04 (Affective Disorders) criteria for paragraphs A and C. As to paragraph B, they opined that she had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. The reviewing consultants also opined that Plaintiff could maintain concentration, persistence, and pace for simple tasks. They further opined that Plaintiff could perform sedentary work except she: could occasionally lift/carry up to 10 pounds; could frequently lift/carry less than 10 pounds; could stand and/or walk (with normal breaks) for a total of 4 hours; could sit (with normal breaks) for a total of 6 hours; had no push/pull limitations; could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs; could frequently balance; must avoid concentrated exposure to

extreme cold/heat; and must avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards.  (R. 83-94.)  In November 2014, these opinions were affirmed on reconsideration.  (R. 96-108.)

      **B.**      <u>**Non-Medical Evidence.**</u>

      In March 2014, Plaintiff submitted a Function Report advising that she lived in an apartment with her fiancé.  She had no difficulties with personal care activities but did not sleep through the night.  She spent about an hour to an hour and a half preparing meals every day and mostly ate frozen food or sandwiches.  She was able to wash dishes and vacuum.  She went out of the house every other day for therapy and doctor visits.  When she went out, she was a passenger in a car because she had no driver's license.  She shopped with her fiancé for food once a week for about an hour.  She was able to handle her finances.  She used to sew and crochet but could no longer do so because of weakness in her right side and inability to focus.  She felt more withdrawn since her diagnosis.  She had difficulties lifting, bending, standing, reaching, walking, seeing, understanding, completing tasks, and using her hands.  She also had difficulties with memory and concentration.  Her impairment caused her to feel fatigued, dizzy and weak.  She followed written and spoken instructions well, and she got along well with authority figures.  (R. 201-08.)

      In October 2014, Plaintiff submitted another Function Report that was substantially similar to the March 2014 Report except as follows.  She could no longer wash her hair by herself because her right side was becoming stiff.  She was not able to prepare meals since January 2013 because she could not stand on her legs for very long.  She spent two minutes once or twice a week preparing frozen dinners.  She sometimes vacuumed once a week.  She had no energy after taking her Rebif/interferon injection.  She did not drive because she was afraid that she would have a spasm while behind the wheel.  She could not go out alone because she might pass out and because

her balance was not stable.  She did not go out shopping.  She felt that she could not talk to friends, family, and neighbors because they did not understand how her impairment affected her life.  She additionally had difficulties squatting, stair climbing, and kneeling.  She could walk for half a block before needing to rest for five or ten minutes.  (R. 217-24.)

In October 2016, Plaintiff was questioned at the hearing by both her counsel and the ALJ. She testified that her driver's license was suspended and that she normally used public transportation, although she could not sit comfortably.  She travelled by bus up to two hours each way to certain doctor appointments.  She could renew her driver's license but did not want to drive because she was afraid that she would experience spasms while behind the wheel.  She went out shopping once every other week.  From 2007 to 2010, she worked for Winfield Security first as a receptionist and then as an office manager.  During that period, she came to work late and took 4-5 days off month.  She voluntarily left that position because she began to experience tingles, spasms, and stiffness in her bilateral hands that adversely affected computer use and handwriting. From 2011 to 2013, she worked 20 hours per week doing secretarial work for her husband's construction business.  She stopped working for her husband because it was too strenuous, and she got depressed.  She was always fatigued but was most fatigued every other day after taking her Rebif injection, which she began taking in January 2014.  She also began taking Klonopin in January 2014, for anxiety.  She took Baclofen for spasms that she experienced daily in her bilateral hands and intermittently throughout the rest of her body.  She also experienced tingling and burning daily in her bilateral hands, legs, and feet.  The Baclofen did not relieve her symptoms. She also took Naproxen for pain, but that medication also did not relieve her symptoms.  When she experienced anxiety, she felt like everything was crashing down and she could not breathe. She cried over everything.  She believed that her anxiety was caused by lack of social life after her

multiple sclerosis diagnosis. She was referred for mental counseling but did not go because it was too far by public transportation. She could lift up to 5 pounds; she could pick up a gallon of milk but could not carry it in one hand at a steady pace. She could stand in one position for only 20-30 minutes because of back pain. She got tired after walking a few steps and needed to rest for 15 minutes before continuing. She could not sit in one position for more than 20 minutes because of back, neck, and shoulder pain. She experienced pain when reaching her arms up. Her physical symptoms worsened when she was exposed to extreme heat or cold. She washed dishes 3 times per week; her husband did all other chores. They ordered in meals at least 4-5 times per week. She slept about 5 hour per night and took a nap every day. She did not use a computer at home because of pain in her hands; it was easier to use her cell phone to send and retrieve messages. (R. 36-75.)

## V.    DISCUSSION

At Step Four, the ALJ found that Plaintiff had the RFC to perform sedentary work except:

> [S]he can understand and execute simple, and routine tasks; the claimant can occasionally climb ramps and stairs, balance on wet, moving or uneven surfaces; occasionally kneel, stoop, and crouch. The claimant can frequently handle, finger and feel. The claimant cannot crawl, climb ladders, ropes or scaffolds or work around hazards, including moving mechanical parts or at unprotected heights. The claimant cannot have concentrated exposure to temperature extremes of heat or cold, wetness, humidity, and must avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. The claimant can make simple decisions and adapt to occasional changes in essential work tasks. The claimant will be absent 1 day per month on a regular and recurring basis due to impairments; and the claimant will be off task 10% of the workday due to the impairments.

(R. 20.) Plaintiff contends that the ALJ's RFC finding was not supported by substantial evidence because: (1) the ALJ erroneously discounted Plaintiff's subjective symptoms; and (2) the ALJ failed to include all credibly established limitations.

A.    **Step Four – Subjective Symptoms.**

An ALJ is required to assess the claimant's subjective complaints using a two-step process. *See* 20 C.F.R. § 404.1529; Social Security Ruling 16-3p, *Titles II & VI: Evaluation Of Symptoms In Disability Claims*, 2016 WL 1237954 (S.S.A. Mar. 24, 2016).[8]  First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations.  To do this, the ALJ must determine if objective medical evidence alone supports the claimant's symptoms; if not, the ALJ must consider other factors, including:  (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  The determination or decision must contain specific reasons for weight given to the claimant's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the claimant and any subsequent reviewer can assess how the adjudicator evaluated the claimant's symptoms.

At Step Four, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

---

[8] Plaintiff cites Social Security Ruling 96-7p, *Titles II & XVI:  Evaluation of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements*, 1996 WL 374186 (S.S.A. Jul. 2, 1996).  *See* ECF No. 14 at 16.  Social Security Ruling 96-7p was superseded by SSR 16-3p, which applies to ALJ decisions

concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21.)  Plaintiff argues:

> [T]he ALJ failed to even seriously consider plaintiff's symptoms of her multiple sclerosis, i.e., left facial weakness, tingling of the left side and twisting of the mouth, weakness and heaviness of the left arm (T. 272-295), intractable body spasm and pains, severe right sided weakness and spasm, increased weakness stiffness of the right side of the body and difficulty in ambulation, left sided facial asymmetry, increased spasticity on the right with spastic gait (R. 302-319) and no longer drives due to significant right sided muscle weakness as a result of multiple sclerosis, was unable to type on a keyboard, being very fatigued almost every day and her balance is very poor (T. 333-336).

ECF No. 14 at 15-16.  The Court disagrees.

In April 2014, Dr. Sutaria completed a General Medical Report form advising that Plaintiff had been a bi-weekly patient since January 21, 2014.  He reported physical findings of paresthesia and a diagnosis of multiple sclerosis with episodic flares based on MRI findings.  Dr. Sutaria opined that Plaintiff could occasionally lift/carry up to 5 pounds in a work day; could stand and/or walk less than 2 hours per work day; could sit less than 6 hours per work day; had unspecified push/pull limitations; and had other unspecified limitations.  He also opined that Plaintiff had a static prognosis and could not tolerate "the above activities."  (R. 349-51.)  The ALJ ascribed partial weight to Dr. Sutaria's opinion because it was offered within several months of Plaintiff's January 2014 initial diagnosis and did "not provide a longitudinal overview of the claimant's medical improvement[.]"  (R. 23.)  The ALJ cited subsequent evidence from 2014 through 2016 that Plaintiff had a normal and steady gait, decreased muscle spasm and weakness, normal motor

---

issued after March 16, 2016.  Social Security Ruling 16-3p "remove[d] the word 'credibility' from the analysis to make clear that there is no examination of a witness's character, and to hew closer to the regulatory language contained within the relevant C.F.R. provisions."  *Pidgeon v. Colvin*, No. 15-cv-2897 (JBS), 2016 WL 2647666, at n.7 (D.N.J. May 9, 2016) (finding that "analysis is the same under either ruling").  The ALJ's decision tracks the language of Social Security Ruling 16-3p.

strength in all extremities, effective use of both upper extremities, intact dexterity, intact reflexes, and no signs of rigidity or spasticity.  (R. 21-22.)  The ALJ correctly observed that Plaintiff's physical examinations were normal even though she continued to complain of intermittent spasms in her neck and upper extremities.  The Court also notes that Plaintiff did not complain to Dr. Sutaria about fatigue following her Rebif injection until February 2016 – two years after she began taking the medication.  Plaintiff cites medical evidence that supports her complaints from January to February 2014 but ignores subsequent evidence of improvement.  The ALJ also ascribed substantial weight to Dr. Friedman's June 2014 opinion that, notwithstanding her depression and mildly impaired short-term memory and social interaction skills, Plaintiff could comprehend and follow multi-step directions and had adequate concentration skills.  (R. 23.)  The ALJ further found that Plaintiff "is independent in personal care, she can do limited house chores, and she is able to independently travel by public transportations."  (R. 22.)

Based on Plaintiff's Function Reports, testimony, and longitudinal medical history, the ALJ concluded that Plaintiff was limited to sedentary work with additional exertional and non-exertional limitations.  *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) ("ALJ affords due weight to a claimant's subjective complaints when he limits her to work at a significantly lower level than previously performed."); *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir.1986) (where ALJ accepted claimant's subjective complaints as "precluding any work above a sedentary level ... the ALJ gave [claimant's] complaints essentially conclusive effect.").[9]  The additional limitations were carefully crafted by the ALJ:

> I have established a limited range of sedentary work activity which includes occasional postural movements and the inability to work around concentrated

---

[9] The Court observes that although the ALJ purportedly ascribed "significant weight" to the Stage Agency reviewing consultants, the ALJ rejected their opinion that Plaintiff could perform limited light work.  (R. 23.)

exposure to temperature extremes such as heat, cold, wetness or humidity and that she must avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation, this also takes into account the claimant's history of asthma/respiratory problems. While the evidence does not establish upper extremity limitations, the claimant has credibly testified to cramps and spasms in her hands, which have been accounted for in the established residual functional capacity in that I limit the claimant to frequently handling, fingering and feeling. Additionally, I have considered the claimant's complaints of depression and anxiety secondary to diagnosis of multiple sclerosis in finding that she is limited to understanding and executing simple and routine tasks that she can make simple decisions and adapt to occasional changes in essential work tasks. I have considered the claimant's impairments in finding that she would be absent one day per month on a regular and recurring basis and I find that symptoms caused by her impairments would cause her to be off task 10% of the workday.

(R. 22-23.) In sum, Plaintiff points to no evidence persuading the Court that the ALJ's assessment of her subjective symptoms is "inherently incredible or patently unreasonable." *Stockett v. Comm'r of Soc. Sec.*, 216 F. Supp.3d 440, 463 (D.N.J. 2016) (quotation omitted); *see Hoyman v. Colvin*, 606 F. App'x 678, 681 (3d Cir. 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") (quotation omitted). The Court therefore finds that substantial evidence supports the ALJ's assessment of Plaintiff's subjective symptoms.

### B.   Step Four – Credibly Established Limitations.

Plaintiff's attack on the ALJ's RFC finding is twofold. First, she argues that the RFC finding is not supported by substantial evidence because it "is simply conclusory and does not contain any rationale or reference to the supporting evidence." ECF No. 14 at 20 (complaining that RFC finding "fail[s] to focus on the plaintiff's ability to sustain work activities"). The Court disagrees. The ALJ's decision accurately summarized the sparse record evidence and repeatedly explained how that evidence was used in crafting the RFC finding. Second, Plaintiff argues that the ALJ committed reversible error by omitting from the RFC finding additional limitations attributable to her impairments. This argument repackages Plaintiff's contention that the ALJ

erred in assessing her subjective symptoms. For the reasons explained in Section V.A. above, the Court finds substantial evidence supports the ALJ's RFC finding.

## V.    CONCLUSION

For these reasons, the Court affirms the Commissioner's decision that Plaintiff was not disabled and will issue an accompanying Order.


Dated:   October 30, 2019                          _____s/ Paul A. Zoss_____
At Newark, New Jersey                          PAUL A. ZOSS, U.S.M.J.